The next case scheduled for argument is Figueroa v. Barr, No. 17-1100. Mr. Mosley, counsel for the Petitioner. In a case where the Department of Homeland Security literally introduced no evidence to challenge or rebut my client's application for a Convention against Torture, relief under the Convention against Torture, the Board of Immigration Appeals erred here as a matter of law on roughly — in roughly three areas. First, in not applying the proper standard of review. Second, in making its own factual determinations. And third, in really mischaracterizing the nature of Mr. Figueroa's claim, and also ignoring key bits of the evidence. In some sense, the government virtually concedes my point here in page 15 of their brief, where they fault me for challenging the Board's factual determinations, but under the law, Padmore and a whole of the authority to make. But if the BIA said that it was — considering the record as a whole, we conclude the Respondent has not demonstrated a likelihood that the Petitioner would be tortured. And, you know, we've said that the BIA can't — has to — can overturn — has to apply the correct legal standard, I guess, in looking at the IJ's fact findings. So I assume that the BIA, if the record were totally devoid of any support for what the IJ found, the BIA would be able to say that this was clearly erroneous. Is that wrong? If it were totally void, to be sure, you're absolutely correct. But in this case, and actually the language that you quote, it's on page — on the record at page 4, I believe, the proliferation, so to speak, of the Board of Immigration Appeals, is certainly not review by — I would submit is not review by clear error. Quite the contrary, Judge Carney. It's the Board of Immigration Appeals making its own — making its own decision. To be sure, they pay lip service, as they have in other cases, to the clear error standard. But the very conclusion is there — is, frankly, there. It does — it does sound that way, but you agree that if the record were devoid — so what would you point to as evidence in the record that substantiates the — or that provides adequate support to the IJ's decision? In particular, the unrebutted, unchallenged expert opinion by — by Dr. Brotherman, starting at page 489 and continuing, I think, partly in terms of what I would consider to be mischaracterization of the evidence, this isn't just a case about — this isn't just a case about prison conditions. It's a case involving my client's unique circumstances of a schizoaffective disorder in a country where there's — as the immigration judge found, as I think Judge — Dr. Brotherman's expert report makes clear, that there's — there's just no medication for — there's no medical treatment for this kind of mental — of mental illness. So — and I think Dr. Brotherman's report was fundamentally mischaracterized here because the Board of Immigration Appeals, again, on — it's on page 4 of the record, the Board of Immigration Appeals says that there's no evidence to distinguish my client with schizoaffective disorder, who's like — who's, the judge found, likely to go to prison, where there's a history of prison abuse. There's no evidence to distinguish him from the general population. And that just simply — Robertson, what — what distinguishes him from the general population of people in Dominican prisons? But that's — but that judge — well, first of all, what distinguishes him from that is that he's got — is he's got schizoaffective disorder for which he's not going to be treated. But I — I read the Brotherman affidavit to say the conditions are horrible in the Dominican prisons, but we have said that that — that that doesn't amount to torture. That affects everybody who's jailed in — in a country that has those conditions. But that's not — but that's not — Judge Jacobs, that's not my point here. The point here is that this is not just a prisons-conditioned case. This, as — as I think Your Honor said, in — in Pierre, there are certainly circumstances where the individual factors of the — of the — of the person certainly should be taken in consideration against the overall background. And that's what — and that's what Dr. Brotherman did here, because my client, unlike, let's say, the — the Petitioner in Pierre, who had, as I recall, diabetes, my client's got a — a mental illness that will cause him to act up, that will, as the immigration judge found based upon those factors, cause him to come in contact with an abusive prison system on which — Sotomayor, will cause him to come in contact with an abusive prison system. Yes, but will cause him — That's — is that because he is — he has been deported from the United States? Because he was a deportee, because he's a deportee, and because he's a criminal deportee, and that's what, among other things, Dr. — Dr. Brotherman's — excuse me, Dr. Brotherman's affidavit certainly said it. Again, that — that's in — that's in the record. That's in the record. But then — but then how — but then your argument proves too much, because right now, virtually everybody being deported from the United States has — has committed a crime of one kind or another. So you're really saying that the prison system in — in the Dominican Republic is so terrible that you can't deport Dominicans back to the Dominican Republic — That's not what I'm — — if they commit a crime here. That's certainly not what I'm saying, Judge Jacobs. What I am saying is a person who has — is a criminal deportee who has schizoaffective disorder, there's nothing in the record to suggest that every person deported back to the immigration — excuse me, back to the Dominican Republic has schizophrenia, has those factors. Also, again, clear distinction from Your Honor's decision in Pierre, has no support network, has absolutely — He — he — he went back to the Dominican Republic to visit. What? He went back to the Dominican Republic to visit. He went back to the Dominican Republic. So what did he visit? He went back to the Dominican Republic once — Yes. — before — before he was deported. He went back to the — Yes, that's correct. — for his father's funeral. That's another significant event. But if you look at his overall mental health history, and again, the — the uncontradicted — excuse me — opinion by — by Dr. Foreman, he's not going to get treatment there. He's going to be — he's going to be, as the immigration judge found — as the immigration judge found, he's going to be coming right in contact. He's going to be acting up. He's going to also — again, it's — But you — there's this fairly long chain of — of — of consequence. I mean — Well, they're really — Basically, he'll — he'll go back. He'll be — he'll be suspect or demonized because he was deported for being a criminal in the United States. Then, because he has schizophrenia, he'll act out. Then he'll get arrested. And then he'll go to jail. And if he goes to jail, the jail's horrible. So — The jail's horrible. It will not give him — not give him treatment for that. And he'll come — he will come in contact with abusive prison guards, as the immigration judge found and as Judge — Dr. Brotherman's report supports that. These are not suppositions, Your Honor.  factual — A factual finding — a factual finding as to what will happen in the future is not like a factual finding of what happened in the past. We would grant that, wouldn't you? I do not agree with that. No? It's — it's — Matter of Zizzo, for example, and the Kaplan case, for example, in — in the Third Circuit, or this Court's own precedent in Hoang says that — that a finding of what's going to happen in the future is a factual finding. The Board has acquiesced in that. Even the government doesn't make that argument here today, Your Honor. So with all due respect, I think you're — But it's — it's a prediction as to what will happen. Yes, and it's a factual — And one — and you have one prediction as to what will happen in the future linked to another prediction as to what will happen in the future linked to a third, and I actually see four of them. But all — all adequately supported within the record by the findings, and no contradictory evidence introduced — introduced by the — by the government. I mean, there are predictive — there are predictive findings, which are — Mr. — Mr. Mosley, could you — excuse me. Could you — could you address the intentionality and the government acquiescence in what might happen in the prison in the future? The — the Board did not challenge that, Your Honor. So you treat that — The Board — the Board did not — absolutely did not challenge that. So that — that issue — and, of course, there's adequate evidence to support that in terms of the lack of accountability. So that's — that's certainly covered. Well, I thought the — the Board's finding was really relatively generic. It says, as a whole, we conclude that he has demonstrated a likelihood he would suffer harm should he be imprisoned. So I guess it doesn't focus on intentionality. It does not focus on that. And I submit that that is the Board re — you know, reweighing the evidence here and making its own — making its own factual determination. I see. Okay. Well, thank you. We'll hear from the government, please. May it please the Court. My name is Jonathan Robbins. I'm here on behalf of William Barr, the Attorney General. Good morning to all of your honors. The issue in this case is whether the Court should dismiss the petition for review for lack of jurisdiction. There's no dispute that Petitioner is removable as an aggravated felon and that the criminal alien, Barr, at Section 1252A2C applies. Now, of course, there's an exception for legal issues, and Petitioner is purporting to raise a legal issue here by arguing that the Board applied an improper standard of review. But a simple examination of the Board's decision reveals that it applied the correct standard of review and applied it correctly. And so once the Court — But your adversary says they recited it, but they didn't apply it. Well, respectfully, Your Honor, we think they did apply it. The Board specifically found that the immigration judge's decision was clearly erroneous. And I think it's important to — Wait, wait, it said clearly erroneous, but then it went on to say, considering the record as a whole, we conclude that the Respondent hasn't demonstrated a likelihood, and so on. It refers to the 2015 Department of State Human Rights Report. It doesn't really discuss the expert declaration. And there was evidence that was in the record that it seems to overlook entirely. And it — while it says clearly erroneous, it doesn't analyze the IJ's lengthy and very detailed opinion with a — apparently seeming to apply clearly erroneous. I think in order to understand what the Board is doing, it's very careful to look at what the Board left undisturbed and what it was specifically addressing by the IJ's decision. If you look at page 4 of the record, which is page 3 of the Board's decision, it leaves a number of the links in the chain of assumptions undisturbed. It does not disturb the fact that the Respondent would not be able to access appropriate medication and treatment for his mental and physical health conditions. It does not disturb the finding that due to those untreated mental and physical health conditions, he would come to the attention of the Dominican authorities and be incarcerated. Kagan. Kagan. Kagan. So what exactly does it find to be clearly erroneous? I'm sure that's where you're going. That's where I'm getting, is to the specific intent, which is the next chain of assumption that it did not assume was true. It says, While he's in prison, he will experience harm rising to the level of torture perpetrated by or with the acquiescence of a government official. I'm sorry, where exactly are you looking? I'm looking at page 4. The second paragraph, where it says, where number 3 is the one that it's addressing. While he's in prison, he will experience harm rising to the level of torture perpetrated by or with the acquiescence of a government official. And when you go to the body of where it's discussing, the Board cites and said, Harsh prison conditions do not constitute torture within the meaning of the regulation, whereas here there is no evidence that the authorities intentionally create and maintain such conditions in order to inflict torture. And then it cites to this Court's decision in Pierre. Pierre was a case all about specific intent. In order to establish a claim under cat protection, you have to demonstrate the specific intent. But that isn't what it says in its concluding sentence, though. It says, Considering the record as a whole, we conclude the respondent has not demonstrated a likelihood that he would suffer harm rising to the level of torture. It doesn't refer to intentionality. Well, that's, well, it's, that is a response specifically to what the immigration judge said in the last paragraph of the decision. It says, Such evidence, this is what the immigration judge said. It says, Such evidence supports the conclusion that the Dominican government on the whole is both unwilling and incapable of preventing torture meted out all too frequently. So it's responding to the notion that when the immigration judge was analyzing this, the immigration judge said that on the whole, the Dominican Republic had the specific intent to inflict torture to the mentally ill. That's not correct. And in fact, the record actively rebutts that. Well, let me just say, though, the fact that we can have this discussion for this argument, that the BIA applied the wrong decision when we're looking at a review of facts or the IJ, and therefore, I would suggest that we likely have jurisdiction here, and so I'd like you to go on to show how the record is deficient. If you turn to page 535, where it talks about the prison conditions and issues regarding torture in the Dominican Republic. It certainly acknowledges that there are a great deal of problems, similar to the as was the case in Pierre with the Haitian prison conditions. But it also points out that the law provides for penalties for torture and physical abuse. It specifically says that senior police officials treated the prohibition on physical abuse and inhuman treatment seriously. It talks about how the Dominican Republic has set up model prisons to try and combat the problems in their prisons and try to create prisons that do work. It talks about how they allow independent monitoring. All of these things are not indicative of a government that intentionally intends to inflict torture. The board — it's no small thing for one of our courts to accuse a foreign government of specifically intending to inflict torture. And if the record shows that they're not — It can be acquiescing in the intentional infliction of severe pain. That was what that — the paragraph in Pierre that your counsel, your adversary pointed to, imagined. And as we — before we get to that, though, do you agree, then, that the IJ's findings with respect to what is more likely than not to happen if the petition were to be returned to the Dominican Republic, that that is a finding of fact? We're having this discussion about findings of fact about what happened in the past versus what is likely to happen in the future. Do you agree that that's a finding of fact? I do agree, although I think as an intellectual or academic matter, I think Judge Jacobs is correct. This is actually a bit of an interesting history. The board, back in 2003, I think, came out with two decisions called matter of ASB and matter of VK, where they said they were going to review these things for de novo. Could you speak a little bit more slowly? Oh, sorry. The board was going to try to address these issues de novo because it wanted to help create uniformity on claims that were very similar. Very oftentimes, asylum claims and cat claims are based on very similar evidence. And so they were trying to — they had an interest in uniformity. And when they came out with those decisions, the courts of appeals essentially rebuked them. I think something like nine or ten said, no, no, no, you must review these decisions for clear error. And so I do think that — and that's because they said that these were findings of fact, including this Court. So I think that's a settlement. So it seems to be a consensus that it's a finding of fact, even if it's in this particular circumstance, even if it concerns the future. Is that right? Yes. So more likely than not. Although we would respectfully agree with Judge Jacobs' point that this is not like other findings of fact. And, in fact, we tried to argue that at various points, but we essentially lost those issues in the courts of appeals. And then EZO, the board, eventually capitulated and said, in light of all the circuit authority, we will review these things for clear error. So that, I think, is well-settled law at this point. So with respect — so, look, as I was saying before, the board, if the evidence shows that the government does not intentionally inflict torture, it has to be able to say so under the clear error standard of review. They can't just let that lie if the evidence actively rebuts the notion that the Dominican Republic is intentionally inflicting torture. And the evidence simply shows that that's not the case here. Well, if it is aware of very harsh conditions, and particularly the unavailability of medication for someone who's severely mentally ill, as apparently this individual has been since his early adulthood, and that prison guards are likely to treat such an individual harshly because they're difficult to contain and maintain — I mean, we have deliberate indifference claims here in U.S. prisons with some frequency that's connected to mental illness. So if the government acquiesces in that, is that not sufficient to meet the standard that Pierre set up? No. Actually, Pierre discusses this at length. First of all, there is a distinction between specific intent and acquiescence. There is an important aspect to consider. When we're talking about cat protection claims, we're not just talking about the protection side of things. There's also that specific criminal intent that has to be shown because there's the other side of cat, which is the criminal liability for the signatories to the convention. So that's a very important part that must be established. And I think that's what the Board was taking issue with in this case. If you look at the immigration judge's decision, the immigration judge's decision doesn't get to this, to the last paragraph, which is oftentimes a sign that it's a weak part of the argument. And the immigration judge just glosses over the fact and says, yes, I think it will show that they'll acquiesce. And the immigration judge seems to be conflating the issue of acquiescence and specific intent, which the Court in Pierre said the Court — that shouldn't be done automatically. You shouldn't automatically conflate those two concepts. So when the Board cites Pierre and specifically talks about the only — only getting to the issue that the fact that this wasn't perpetrated by the Dominican government, that's where I think the Board had to say that this was clear error because the evidence just simply does not show, and in fact shows to the contrary. The Dominican Republic is aware of the problematic condition. Let me interrupt for just a second, though. The expert spoke to many relevant considerations, and the BIA didn't seem to take those into particular account. And that's why that long paragraph, to me, feels very much like de novo review of the record, where they just chose to discount and overlook the IJ's credibility — or credibility and other kind of determinations about the weight to assign that affidavit. So why, again, were they correct to do — do you agree that they did that, and if so, was that correct? Wasn't that new fact-finding by them? I don't think so, because the expert statement gets — certainly gets to the deplorable conditions, but I don't know that it gets specifically to the issue of specific intent. So if the Board is talking about specific intent, there's no reason why it would specifically look to expert declarations that don't really get to the heart of that issue. It did get to — it did cite to the State Department reports, which do get to the issue of specific intent. And that specific criminal liability, that criminal intent, that's where the claim was deficient, and I think that's why the Board focused on the State Department reports rather than the expert report, which certainly got to the deplorable conditions. Nobody would dispute that the conditions in the Dominican Republic are good, at least with respect to their traditional prisons. The model prisons are a different situation, and the State Department reports indicate that those — that those prisons are relatively well run and that people do receive the proper treatment in those — in those prisons. Very good. I see that I'm out of time. Unless there are any further questions, we would respectfully ask that the petition for review be dismissed. Very good. Thank you very much. Thank you for your time, Your Honors. Mr. Mosley, you have two minutes for rebuttal. Just very briefly, I think, first of all, the Brotherton expert report is at the very least mischaracterized, because all throughout he talks about the harm that — and the likelihood of this person being subject to abuse, even death, which is some— In jail. In jail. That assumes he'll commit a crime. What? That assumes he'll commit a crime. That is — that is a — that is based upon, again, what the immigration judge is finding on— Mr. — Mr. Mosley, please let Judge Jacobs finish when he's speaking. No, we're — we're in a dialogue. It's okay. And that's based on the idea that he wouldn't be able to find a job to make a legal living. Yes, that's correct. And also — and also as a situation as a criminal deportee, as Mr. — as — certainly as Judge— The — the paragraph 5 of the Brotherman affidavit says that upon arrival in the Dominican Republic — Republic, individuals deported from the U.S. go through a specially designed registry process. And it said that previously these data could be accessed by employers and banks to check on the state of — status of prospective employees or customers. It's unclear on the new system who has access to these data. So even if you rely on the Brotherman affidavit, I'm not sure how you get to the idea that he's not going to be able to find a job because the employee or — or is going to know that he's a criminal deportee. In part because of his — again, that's actually something that's not even challenged by the Board of Immigration — Immigration Appeals. But I'm reading the Brotherman affidavit, and you keep citing the Brotherman affidavit, so why shouldn't I read it? No, you — you certainly should, Your Honor. But I think the more fundamental question here is the fact that the Board of Immigration Appeals ultimately did — and I don't think there's any way around that — did its own factual finding. And furthermore, if there is any doubt about that, even giving the government more than it perhaps is due here, that, I submit, would — would justify at the very least a remand for clarity from the — from the Board. All right. Thank you. I see my time is up. Yep. Thank you for your arguments.